## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAJOR, LINDSEY & AFRICA, LLC,**<br>**7317 Parkway Drive**<br>**Hanover, Maryland 21076**<br><br><br>        **Plaintiff,**<br><br>        **v.**<br><br>**LAUREN DRAKE**<br>**2619 Amanda Court**<br>**Vienna, Virginia 22180**<br><br>**and**<br><br>**MLEGAL GROUP, INC.,**<br>**437 Kipling Street, Suite 100**<br>**Palo Alto, California 94301**<br><br><br>        **Defendants.** | **Case No. _____** |

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff Major, Lindsey & Africa, LLC, ("MLA"), by counsel, hereby submits this Complaint for Injunctive Relief against Defendant Lauren Drake ("Drake") and MLegal Group, Inc. ("MLegal"), and states:

## NATURE OF THE ACTION

1.      This action is brought by MLA to prevent its former employee, a partner-level attorney recruiter in MLA's Partner Practice Group, from violating her contractual obligations. Drake has breached and is continuing to breach the non-competition provision of her employment agreement by competing directly with MLA when she recently joined its competitor, MLegal, working in the same market and in the same business for which she worked for MLA. Since

announcing her resignation from MLA, Drake is now in a position to improperly solicit MLA's clients and candidates, and to disclose and utilize confidential and proprietary information to which she had access at MLA.

2.      On or around August 4, 2014, Drake executed an agreement not to compete with MLA.

3.      On September 24, 2019, Drake resigned her employment with MLA and advised MLA that she wished to continue working with attorney candidate clients with whom she had established relationships on MLA's behalf. In an email providing her resignation, she stated that there were multiple partner-level candidates whom she was servicing that were currently in the process of interviewing with major law firms across the metropolitan Washington D.C. area, all of whom she wished to continue working with, and to receive her commission from MLA, in the event that these candidates were hired by the respective law firms. Before MLA could even respond to this proposal (to which it objected), Drake emailed all of the candidates to inform them that she was changing her employer and the clients could remain her clients once Drake was under the banner of MLegal should they so choose. In at least one instance, this created a potential dispute with a law firm about who would be entitled to a commission for any placement of a candidate. While MLA acted quickly to retain these candidates, Drake's actions evince a disregard of her contractual obligations.

4.      In violation of her non-competition provision, Drake continues to be employed with MLegal, a legal recruiting firm that competes directly with MLA in the Washington D.C. metropolitan area. MLegal has recently established a location in the District of Columbia, and already recruited two other MLA employees to the MLegal office in Washington D.C., aside from Drake, who is the only one of the three with a non-compete restriction.  Upon information and

belief, Mlegal is looking to staff its DC office with trained recruiters, including Drake, for purposes of gaining a fast-track competitive advantage in the market without having to undertake the investment of time and resources otherwise required.

5.      As MLegal continues to employ Drake, who is currently in violation and continues to be in violation of her Terms and Conditions provisions, MLA seeks the relief described herein to prevent Defendants from causing further harm to MLA's business and operations in the District of Columbia.

## PARTIES

6.      MLA is a limited liability corporation duly organized and existing under the laws of the State of Maryland, with its principal place of business located in Maryland.   None of its members are citizens of the states where Defendants are citizens.

7.      Upon information and belief, Drake is a resident of Virginia who lives at the following address: 2619 Amanda Court Vienna, Virginia 22180. She was employed by MLA as a partner-level attorney recruiter in MLA's Partner Practice Group from August 2014 until September 24, 2019.

8.      Upon information and belief, MLegal Group, Inc. is Drake's new employer, and is a corporation organized under the laws of the State of California, with a principal place of business in Palo Alto, California.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

10.     This Court has the authority to exercise personal jurisdiction over Defendants pursuant to the District of Columbia's long-arm statute because Defendants have transacted business in the District of Columbia, contracted to supply services in the District of Columbia, caused tortious injury in the District of Columbia, and because the exercise of personal jurisdiction would comport with the requirements of due process since Defendants have availed themselves of the privilege of conducting activities within the District of Columbia, invoking the benefits and protections of its laws.

11.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in the District of Columbia.

## FACTUAL BACKGROUND

### MLA's Business

12.     MLA is engaged in the business of locating, selecting, screening, mobilizing and placing experienced attorneys in in-house, associate, partnership and corporate counsel employment positions at law firms and corporations throughout the United States. For three consecutive years, and including most recently in March 2019, MLA has been named the Best National Legal Recruiter by *The National Law Journal*

13.     In the Washington, D.C. metropolitan area, MLA is widely considered the premier legal executive search firm. MLA's Washington D.C. office has existed since 2003, and it maintains longstanding relationships of trust and goodwill with highly recognized law firms, corporations and attorneys throughout the region.

14.     MLA has invested and continues to invest significant resources to develop highly confidential, non-public information, methods and techniques (and databases to store such information)   to: (a) identify contacts with major law firms and corporations that utilize

4

professional attorney recruitment to fill specialized, technical attorney staffing needs; (b) identify the key individuals responsible for recruitment of attorneys with those firms and corporations; (c) maintain, develop and nurture business relationships (and associated goodwill) with those entities and individuals; (d) learn these clients' business and legal expertise needs, including a deep knowledge of law firm culture, work environment, perspective, internal operations, and career paths; (e) develop innovative solutions to meet clients' legal staffing needs; (f) develop, screen, and maintain highly-qualified attorney candidates for placement with their clients; (g) recruit, develop and maintain relationships (and associated goodwill) with attorneys with various expertise and experience; (h) through these relationships, develop an understanding of the attorneys' unique goals, personal backgrounds, and employment desires that is shared internally with other MLA recruiters for market intelligence, data analytics and training purposes,  and (i) set appropriate pricing to attract and maintain law firm and corporate clients.

15.    MLA recruiters, including Drake, are provided extensive training in several forms including: (a) access to proprietary guide books and written job aids which provide information about the process of connecting with attorney candidates and working with them to determine their motivations for finding new employment; (b) classes taught by high-level, experienced MLA recruiters, which train on subjects such as techniques for cold-calling attorney candidates, how to complete and close the intricate deals related to moving law firm partners from one firm to another; (c) training videos which recruiters are able to view that cover topics such as (i) how to handle the merger of law firms, (ii) what questions to ask of the law firms, (iii) cold calling techniques, and (iv) how to ensure the best submissions of attorney candidates to law firm clients so they are likely to be selected; and (d) one-on-one training with other senior recruiters on a day-to-day basis who provide essential know-how for performing as a recruiter.

16.     MLA has invested considerable time, expense and resource in its recruiters, including Drake, to train them and permit them to perform their recruiting work for MLA competently and credibly.

17.     MLA Recruiters, such as Drake, become inexorably and intimately knowledgeable regarding MLA's law firm clients, attorney candidate pools and recruiting sources and methods; methods and techniques for analyzing and matching clients' needs with candidates' capabilities, including key intelligence about law firm culture, work environment, career paths, and compensation; financial analysis and formulas for setting prices and conducting business at a profit; quality control measures and means of maintaining client satisfaction; and other items of confidential business information that give MLA a competitive advantage in the legal recruiting marketplace.

18.     The information, training, databases, and methodologies developed by MLA described above are valuable, confidential and proprietary to MLA and are not readily available in the public domain. The aforementioned information and goodwill developed have significant economic value to MLA, and would be of significant economic value to competitors in the professional legal recruitment and placement industry, for reasons including the following:

- The processes by which MLA matches candidates with clients – from the initial marketing stages and candidate recruitment, through placement and continued monitoring of client satisfaction and future client needs – involve methods and techniques developed internally and built upon by MLA over many years;

- Competition in the attorney recruiting industry in general is fierce and highly dependent on a search firm's development, maintenance and use of nonpublic information relating to clients, prospective clients, candidates and prospective candidates;

- Successful legal recruiting firms and corporations use this information to develop contacts, build their reputation, and acquire clients' trust; and

- Client and candidate relationships tend to be long-term and recurring, and are developed only after a considerable investment of time and resources.

6

19.     MLA has a legitimate business interest in keeping the above-described assets confidential, in maintaining its business goodwill and relationships, and not allowing its trade secrets and other confidential information to be disclosed to its competitor through any improper means.

20.     To protect its business goodwill and client relationships, confidential information and trade secrets, MLA requires its legal recruiting professionals to sign written agreements that, *inter alia*, contain certain limited restrictions on their business and employment activities after the end of their employment relationship with MLA.

**Drake's Employment and Employment Agreement**

21.     Drake began her career in August 2014 at MLA as a recruiter, having previously worked for a placement firm that specialized in searches for human resources professionals.

22.     Upon commencing her employment with MLA in MLA's Partner Practice Group ("PPG"), Drake received one-on-one training from several experienced and successful partner recruiters within MLA.  Over the course of her tenure, she worked intensively with a senior recruiter who spent significant time and attention to helping Drake learn techniques and approaches for successful recruitment and placement of law firm partners.

23.     As Drake lacked any experience in the legal recruiting industry, and more specifically the partner legal recruiting industry, prior to joining MLA, Drake learned the business through the extensive training she received and her on-the-job exposure to MLA's unique methodologies, techniques, and manner of satisfying its law firm client needs.

24.     To further protect its confidential and proprietary information, as well as its client relationships, MLA has adopted company-wide written policies restricting the disclosure and/or use of this information other than for authorized company purposes and required every employee

7

to be subject to written agreements prohibiting the use and disclosure of confidential and proprietary information of MLA.

25.    As Drake had access to MLA's confidential and proprietary information, techniques, and goodwill in the professional recruitment and placement industry, she executed a written employment agreement which contained confidentiality, non-competition and non-solicitation provisions, and which were a condition of her employment.

26.    On or about August 4, 2014, Drake executed an agreement with MLA which contained an attachment entitled "Terms and Conditions of Employment Agreement with Major Lindsey & Africa, LLC." ("Terms and Conditions."). *See* Exhibit A hereto.

27.    The Terms and Conditions contain the post-employment restrictive covenants which govern Drake's conduct after her employment with MLA.

28.    The Terms and Conditions contain the following non-competition covenant:

(5)    Non-Compete Covenant: You agree that during your employment with MLA and upon the termination of your employment for any reason for a period of one (1) year thereafter, you shall not directly or indirectly engage in or prepare to engage in, or be employed by, any business that is engaging in or preparing to engage in any aspect of MLA's Business in which you performed work during the two (2) year period preceding your termination of employment, within a radius of fifty (50) miles of the office in which you worked at the time your employment terminated or any other office in which you worked during the two (2) years preceding termination of employment, or as much geographic territory as a court of competent jurisdiction deems reasonable. The prohibitions contained in this Paragraph shall extend to (i) activities undertaken by you directly on your own behalf, and to (ii) activities undertaken by you indirectly through any individual, corporation or entity which undertakes such prohibited activities with your assistance and in or with respect to which you as an owner, officer, director, trustee, shareholder, creditor, employee, agent, partner or consultant or participate in some other capacity. "MLA Business" means the business of providing legal search, employment consulting and recruiting services relating to the permanent placement of attorneys into law firms and corporations and other lines of business MLA may engage in, enter, or prepare to enter during your employment. This provision shall not restrict you from owing a passive investment interest of less than 5% of the outstanding equity ownership or share in an organization represented by securities publicly traded on a recognized national securities exchange.

29.     The Terms and Conditions also contain the following non-solicitation covenant:

(6)     Non-solicitation Covenant: You agree that during your employment with MLA and upon the termination of your employment for any reason, you shall not, directly or indirectly, for a period of one (1) year thereafter:

(a)     Approach, contact, solicit or induce any employee of MLA:
  (i)     to provide services to any individual, corporation or entity whose business is competitive with MLA, or
  (ii)    to leave the employ of MLA; or

(b)     Approach, contact, solicit or induce any individual, corporation or other entity which is a client or customer of MLA, about which you obtained knowledge by reason of your employment by MLA, in an attempt to:
  (i)     enter into any business relationship with a client or customer of MLA, with which you worked during the two (2) year period preceding termination of your employment, if the business relationship is competitive with any aspect of MLA's Business, or
  (ii)    reduce or eliminate the business such client or customer conducts with MLA; or

(c)     Approach, contact, solicit or induce any person who has been a Candidate of MLA within the two (2) year period preceding termination of your employment and about whom you obtained knowledge by reason of your employment with MLA:
  (i)     to cease working for any clients or customers of MLA, or
  (ii)    to refrain from beginning work for any clients or customers of MLA, or
  (iii)   to provide services to any individual, corporation or entity whose business is competitive with MLA's Business.

As used in this Article 6, "approach, contact, solicit or induce" shall include any communication with any individual, corporation or entity in which you shall request or suggest, whether explicitly or by implication, that such individual, corporation or entity do any of the prohibited activities. As used in this Article 6, "Candidate" means a person who is listed in the candidate database maintained by MLA, has been placed by MLA, or who MLA is attempting to place with a client or customer, for the purpose of performing services. The prohibitions contained in this Article 6 shall extend to (i) activities undertaken by you directly on your own behalf, and to (ii) activities undertaken by you indirectly through any individual, corporation or entity which undertakes such prohibited activities with your assistance and in or with respect to which you are an owner, officer, director, trustee,

shareholder, creditor, employee, agent, partner or consultant or participate in some other capacity.

30.     Additionally, Drake agreed to abide by the following non-disclosure obligation to protect against the wrongful use or disclosure of MLA's confidential information:

(4) Confidentiality:

…

(e) You agree that during your employment with MLA and thereafter, you will strictly maintain the confidentiality of all confidential information to which you may be exposed during your employment with MLA ("Confidential Information"). You specifically agree that you will not download or in any other way copy any portion of the MLA database or any information therein or any other materials drafted by MLA not available to the public. Confidential Information includes, but is not limited to, the following:

(1) Information about MLA: information provided to you by MLA that is not otherwise available in the public domain, including but not limited to, MLA's strategy or plans, financial information fee structures and commission information;

(2) Information about MLA Clients: all non-public confidential information concerning MLA clients including but not limited to client names not generally known in the industry, names of client contacts and related contact information, contracts, proposals, policies, client financial information, client administration, current or anticipated personnel needs, performance of client's employees, and all other non-public information; and

(3) Information about MLA Candidates: all non-public, confidential information concerning MLA candidates, including but not limited to candidates' names, social security number, non-public background and contact information, career history, desire to explore career opportunities, willingness to talk with another potential employer, and other non-public information about the candidate.

(f) MLA realizes that some of this Confidential Information regarding candidates and clients cannot be returned to MLA because it is information contained in your memory. Nonetheless, information that is in your memory is subject to the same nondisclosure requirements stated herein, if it is non-public, confidential information you learned during your employment at MLA.

31.     Concurrently with the execution of her Terms and Conditions, Drake also executed an arbitration agreement, titled Mutual Agreement to Arbitrate Claims ("Arbitration Agreement"). While the Arbitration Agreement covers claims arising out of Drake's employment with MLA, it

contains an provision that excludes from arbitration "[c]laims, either by the Company or by [Drake], seeking injunctive or declaratory relief with respect to any confidentiality, return of property, non-solicitation, non-compete or nondisparagement covenants that [Drake has] with the Company." *See* Exhibit B hereto.  Accordingly, MLA brings its claims herein for purposes of injunctive relief only, and reserves for arbitration a damages proceeding.

**Drake's Resignation and Post-Employment Activities**

32.     MLegal is a legal services search firm that engages in recruiting and placing attorneys in partner and associate positions in law firms, and in in-house counsel positions in corporations.

33.     According to its website, MLegal distinguishes itself from other competitors by emphasizing its "market knowledge," along with the "effectiveness" of its recruitment process.

34.     MLegal is a director competitor to MLA.

35.     On or about September 24, 2019, Drake announced to Jeff Lowe ("Lowe"), Global Practice Leader of MLA's Law Firm Practice Group and a Managing Partner in the Washington, D.C. office for MLA, that she was resigning.

36.     Following her announcement, on the same day, Drake called her direct supervisor, Laurie Caplane ("Caplane"), MLA PPG Senior Executive and Managing Partner, to communicate her resignation.

37.     During the phone call, Drake told Caplane that she planned to go work for MLegal in its Washington, D.C. office, and Caplane reminded Drake of her non-compete agreement.  In response, Drake stated that she hoped she and MLA could "work something out."

38.     Caplane further told Drake that Caplane needed to discuss the situation with MLA's senior executives and counsel, and would need to circle back with Drake later.

39.     Shortly after Caplane's email, Drake emailed Caplane to confirm her resignation in writing, and to propose terms for transition of current attorney candidates with whom she was working on placing at the time.

40.     Drake proposed that she would continue to work with those candidates, and that MLA would pay her full commission upon the placement and hiring of such attorney candidates with the respective MLA firm clients.

41.     In her email, Drake also proposed that MLA leave her MLA email account active for three days following her resignation so that Drake could email her attorney candidate contacts and apprise them of her personal contact information, and also so she could copy any of the candidates' personal information in case she further needed to serve them.

42.     After sending this email, prior to receiving any approval from MLA of the proposed transition plan, Drake emailed the attorney candidates with whom she worked to tell them of her contact information and the fact that she was resigning from MLA. She further told the attorney candidates that they could continue to work with her once she joined her new employer, MLegal.

43.     After reviewing her email and discussing with other MLA senior executives and counsel, on September 25, 2019, Caplane emailed Drake that Lowe would be reaching out to attorney candidates with whom Drake was working, and would be communicating with Drake in the event that he had questions.

44.     On September 26, 2019, upon learning that Drake was contacting MLA attorney candidates and telling them that they could work with her at MLegal, MLA promptly informed Drake that she should call the attorney candidates and inform them that MLA would continue to have a relationship with them.

45.     Drake's sudden resignation and contacting of the attorney candidates created confusion in the market. In at least one instance, a law firm client of MLA contacted MLA to inquire whether the placement fee, should the attorney candidate be hired, be paid to MLA or Drake and her new employer, MLegal. Further, at least one attorney candidate expressed directly to MLA her frustration and confusion because of the uncertainty created by Drake's departure and Drake's solicitation of the candidate to remain with Drake at MLegal.

46.     Immediately following her resignation, Drake began working at MLegal as a partner-level attorney recruiter. Like MLA, MLegal is a business involved in attorney search and talent management, and provides associate, partner, and in-house counsel level search and placement services to law firms and corporations.

47.     Drake began working, and continues to work for MLegal in its District of Columbia office within 50 miles of the location that she worked for MLA, and in a position where she inevitably has used or disclosed or will use or disclose MLA's confidential information by doing the same job in the same market area in which she worked for MLA.

48.     Upon information and belief, MLegal hired Drake with full knowledge that she was bound by the terms of her Terms and Conditions with MLA.

49.     Upon information and belief, MLegal sought to hire Drake because it wanted to capitalize on her relationships and goodwill with MLA clients and attorney candidates and her knowledge of MLA's confidential and proprietary information.

50.     Until recently, MLegal did not have a presence in the District of Columbia, and, upon information and belief, looked to hire Drake with the intent of establishing a strong competitive position in the market, without having to make the same investment of time and resources that MLA had to make, by hiring Drake in violation of her obligations.  In the prior six

months, MLegal has already recruited two other former MLA employees for purposes of gaining a market foothold in the District of Columbia.

51.    MLegal is, and at all relevant times was, familiar with the Terms and Conditions prohibiting Drake from disclosing or using MLA confidential information, prohibiting her from working for a competitor within 50 miles of her previous work at MLA, and prohibiting her from soliciting MLA's clients, attorney candidates, and employees.  MLegal's Chief Business Officer was formerly MLA's chief executive officer who is well familiar with MLA's practices and operations, and, upon information and belief, knew about Drake's restrictions during the process of recruiting her.  On September 25, 2019, immediately following Drake's resignation the prior day, MLegal's founder reached out to MLA's president to acknowledge that MLegal was aware that Drake had a contract containing restrictive covenants.

52.    In an effort to resolve this situation before resorting to litigation, MLA placed both Drake and MLegal on written notice of Drake's post-employment obligations, and its intent to bring a lawsuit to enforce its rights. However, they rejected Drake's non-compete obligation. Accordingly, MLA must proceed with the instant action.

53.    MLegal has notice of MLA's contractual rights, and continues to employ Drake in violation of, and interference with those rights.

54.    Upon information and belief, MLegal has communicated with Drake for purposes of obtaining information about other employees of MLA to solicit them to leave their employment with MLA and join MLegal.  Another MLA employee who worked closely with Drake resigned from MLA to work for MLegal very shortly before Drake's resignation, and, upon information and belief, Drake was involved in this employee's recruitment and departure given the likely lack of coincidence in the timing of their both leaving.

14

55.     As a direct and proximate result of Drake's actions, including, but not limited to her breach of the Terms and Conditions, and MLegal's wrongful interference, MLA has been, and continues to be, damaged in an amount that is difficult, if not impossible, to determine unless Drake and MLegal are enjoined from the aforementioned conduct.

**COUNT I**
**BREACH OF CONTRACT**
**(Defendant Drake)**

56.     MLA incorporates herein by reference the allegations of the preceding paragraphs.

57.     Drake's Terms and Conditions is a valid and enforceable contract between Drake and MLA, and MLA has performed all necessary conditions precedent to its enforcement.

58.     By accepting employment with MLegal, a direct competitor of MLA, within 50 miles of the office where Drake worked for MLA and engaging in an aspect of MLA's business for which she performed services within the last two years of her employment, Drake has breached, and continues to breach, the Terms and Conditions.

59.     By such action, Drake has caused and continues to cause MLA immediate and irreparable harm for which MLA has no adequate remedy at law.

60.     Drake will continue such wrongful conduct unless enjoined.

61.     As a consequence, MLA is entitled to preliminary and permanent injunctive relief.

**COUNT II**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Defendant MLegal)**

62.     MLA incorporates herein by reference the allegations of the preceding paragraphs.

63.     Drake's Terms and Conditions is a valid enforceable contract between Drake and MLA.

64.     At all times relevant to this action, MLegal is and was aware that Drake was previously employed by MLA and that her post-employment activities are governed by an agreement which contained restrictive covenants, including a non-compete covenant.

65.     MLegal intentionally and without justification solicited and hired Drake to compete directly with MLA in a position with MLegal that violated and continues to violate the non-compete restriction of the Terms and Conditions.

66.     As a result of MLegal's intentional acts, MLegal caused Drake to breach her Terms and Conditions with MLA and interfered with MLA's contractual rights.

67.     By such action, MLegal caused and continues to cause MLA immediate and irreparable harm for which it has no adequate remedy at law.

68.     MLegal will continue such wrongful conduct unless enjoined.

69.     As a result of MLegal's tortious interference, MLA is entitled to preliminary and permanent injunctive relief.

WHEREFORE, MLA respectfully requests this Court enter an order:

A.     Preliminarily and permanently enjoining Drake, for one (1) year from competing with MLA, as described in the Terms and Conditions of her Employment Agreement, in the geographic territory described therein;

B.     Preliminarily and permanently enjoining Drake, for one (1) year from soliciting or attempting to solicit MLA's clients, candidates, or employees, or assisting any other person in any way soliciting MLA's clients, candidates, or employees;

C.     Preliminarily and permanently enjoining Drake from disclosing any of MLA's confidential or proprietary information, or using such information to benefit herself or a third party;

D.     Preliminarily and permanently enjoining MLegal, for one (1) year, from continuing employment of Drake with MLegal in a position that allows her to compete directly with MLA and otherwise violating the Terms and Conditions;

E.     Preliminarily and permanently enjoining MLegal from interfering with other contractual rights of MLA by hiring or retaining any other of Plaintiff's employees in violation of any restrictive covenants to which they are subject;

F.  Awarding MLA its attorneys' fees, costs and expenses, as well as pre- and post-judgment interest; and

G.  Granting such other and further relief as the Court may deem just, equitable and proper.

Dated:  October 31, 2019

/s/ Paul J. Kennedy
Paul J. Kennedy (D.C. Bar No. 428623)
Bradley C. Tobias (D.C. Bar No. 241002)
LITTLER MENDELSON, P.C.
815 Connecticut Avenue, NW
Suite 400
Washington, DC  20006-4046
202.842.3400 (main telephone)

Jacqueline C. Johnson (*pro hac vice
application forthcoming*)
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, TX  75201.2931
214.880.8100 (main telephone)

*Counsel for Plaintiff Major, Lindsey & Africa,
LLC*